Jon P. LUSKIN and Susan F. Luskin, his wife, Plaintiffs-Appellants,

v.

Daniel P. STAMPONE, Defendant-Appellee.

Supreme Court of Delaware.

Submitted March 17, 1978.

Decided May 1, 1978.

Alfred J. Lindh, Wilmington, for plaintiffs-appellants.

Warren B. Burt, of Prickett, Ward, Burt & Sanders, Wilmington, for defendant-appellee.

Before HERRMANN, C. J., and DUFFY and McNEILLY, JJ.

PER CURIAM:

In this action for damages arising from an automobile-bicycle collision, the jury returned a verdict for defendant. Plaintiffs' motion for a new trial was denied and they appeal.[1] The only question before us is

---

1. Plaintiff husband was involved in the collision and his wife's claim is derivative. All further references in this opinion to "plaintiff" are to the husband only, unless the text indicates otherwise.

whether the Trial Court abused its discretion by not ordering a new trial. *Chavin v. Cope*, Del.Supr., 243 A.2d 694, 695 (1968).

■ After a review of the entire trial record, we conclude that the jury's verdict was manifestly against the weight of the evidence, and that a new trial should have been ordered. In short, abuse of discretion in the legal sense, that is, denial of a new trial is untenable and unreasonable, *Larrimore v. Homeopathic Hospital Association of Delaware*, Del.Supr., 181 A.2d 573, 574 (1962), has been shown by plaintiffs.

Briefly, the facts are these: Plaintiff, as one of an organized group of bicyclists, was riding in a southerly direction on Milltown Road in a lane reserved for bicyclists. When plaintiff was approaching the intersection with Grendon Drive, defendant's automobile was stationary, facing toward plaintiff in preparation for a left turn into Grendon Drive. About the time plaintiff entered the intersection, defendant's automobile proceeded to make the left turn, struck plaintiff and his bicycle, and threw him onto the roadway.

While this is essentially a fact case, two aspects require comment for present purposes.

■ First, a review of the transcript establishes that defendant was negligent as a matter of law. Under undisputed facts, plaintiff had the right-of-way and, therefore, defendant was required to remain stationary and yield the right-of-way before making his left turn because plaintiff was so close as to constitute an immediate hazard. 21 *Del.C.* §§ 4132, 4155.[2] Defendant's failure to do so constituted negligence *per se*, because he violated a statute enacted for the safety of others. *Sammons v. Ridgeway*, Del.Supr., 293 A.2d 547 (1972). We make no comment on whether such negligence was a proximate cause of the collision. That is a jury question.

■ Second, a review of the record also raises serious doubt as to whether the evidence rationally supports a finding that plaintiff was negligent in a way that proximately caused the collision. It is undisputed that plaintiff was riding in the bike path and that he was hit broadside by defendant while he was in the center of Grendon Drive into which defendant was turning. While there may be evidence of negligence on plaintiff's part, it appears very likely that the jury did not understand the importance of causation in evaluating such evidence. For example: while evidence was introduced to the effect that plaintiff felt uncomfortable about the cars passing him on the road, and that he did not observe defendant's automobile until within fifteen to twenty feet of the intersection, such evidence is significant only if it shows that plaintiff failed to maintain a proper lookout once inside the zone of danger.[3] In short,

---

**2.** 21 *Del.C.* § 4132 reads in part as follows: "The driver of a vehicle intending to turn left within an intersection . . . shall yield the right-of-way to any vehicle approaching from the opposite direction which is so close as to constitute an immediate hazard."
And 21 *Del.C.* § 4155, at the time of the accident, read in part as follows:
"(a) No person shall . . . turn a vehicle from a direct course . . . unless and until such movement can be done with reasonable safety. . . ."
The current statute requires that the turn not be made until it can be "made with safety without interfering with other traffic." See 60 *Del.L.* ch. 701.

**3.** Plaintiff testified that defendant's car was stopped; thus:

"A I saw the car stationary in the roadway. It was stopped. There was traffic going in my direction, and as I approached, the vehicle was still stationary. Assuming that the driver saw me, and I continued to cross the intersection and the car started up and—
Q Which car started up?
A The Stampone vehicle started, and the collision was even before I got across the entrance into the development."
And plaintiff later testified:
"Q Prior to the time Mr. Stampone's car began moving, in order to complete it's [sic] left turn, did you see any movement of the car indicating that he was going to try to complete the turn before you got to the intersection?

the issue of proximate cause of any negligence on plaintiff's part is the significant issue which required careful consideration and instruction. We also note that there is little, if any, evidence to show that plaintiff was exceeding the speed limit, or riding at an excessive speed.[4] And it appears that once defendant wrongfully turned into the intersection, plaintiff had no time for evasive action.[5]

In sum, under the record, the jury's verdict is manifestly and palpably against the weight of the evidence and, to avoid a miscarriage of justice, *McCloskey v. McKelvey*, Del.Super., 174 A.2d 691 (1961), a new trial must be ordered wherein defendant's negligence will be established as a matter of law and issues of contributory negligence and proximate causation submitted to the jury under appropriate instructions.

\*     \*     \*     \*     \*     \*

Reversed and remanded for proceedings consistent herewith.

A At the time of approach of intersection, no, there was no movement of the car."
And Mrs. Bahnsen, an eyewitness, testified:
  "Q At the point he was just entering the intersection, was the small green [defendant's] automobile still stationary or was it moving?
  A It was stationary."

4. Thomas Pendelton, the bicycle group's leader, testified as follows:
  "Q And can you, in any way, describe how slowly or how rapidly, as the case may be, the group as a whole was progressing?
  A Oh, fairly slowly. Probably an average of about ten miles an hour as a group. However, we had some relatively fast riders who were way up in the front, and I'm sure they were going much faster.
  Q Could you estimate how fast the fastest riders in the group had been moving?
  A Well, they would often go for fifteen, maybe as much as twenty . . .

Q And in the specific area where this happened, would you be able to estimate from the location of the riders approximately what their range of speed might have been?
  A I'd say between ten and twelve miles an hour."

5. Plaintiff testified that:
  "A It happened so fast, it surprised me. A few seconds.
  Q When you saw his vehicle approaching you, what did you do?
  A There's nothing I could do. My reaction time was just nil. I couldn't do anything.
  Q Do you recall whether you tried to either apply the brakes or take evasive action, or do anything?
  A It was a matter of seconds before I saw the car turn into me; that there was no time to veer away or increase speed or stop."